888 P.2d 962

**Judy MAESTAS, Petitioner–Appellant,**

v.

**HONSTEIN OIL COMPANY, INC., Employer, and Fireman's Fund Insurance Company, Insurer, Respondents–Appellees.**

**No. 15401.**

Court of Appeals of New Mexico.

Nov. 8, 1994.

James G. Chakeres, Albuquerque, for petitioner-appellant.

Robert A. Martin, Bradley & McCulloch, P.A., Albuquerque, for respondents-appellees.

## OPINION

MINZNER, Chief Judge.

Worker appeals from a compensation order denying her benefits. Employer successfully relied upon the false representation defense discussed in a number of cases and recently analyzed by this Court in *Lamay v. Roswell Independent School District*, 118 N.M. 518, 882 P.2d 559 (Ct.App.1994). In *Lamay*, we fashioned a test to be applied in false representation cases to assist in determining whether all of the elements of the false representation defense have been adequately proved by the employer. Since the worker in *Lamay* had expressly declined to argue the issue of the sufficiency of the evidence supporting the workers' compensation judge's (judge) decision, we did not apply the new test to the facts of that case, but instead remanded it to the workers' compensation judge for further proceedings. In this case, however, Worker does argue that there was insufficient evidence supporting the judge's findings. Therefore, the question presented by this appeal is whether, under the test set out in *Lamay* and considering the standard of review, Employer has adduced sufficient evidence to prove the false representation defense.

When Worker applied for a cashier job with Employer, she filled out an employment application containing the following question and answer:

> List any physical limitations or chronic illnesses. None.

The judge found that this answer was false, that Worker knew it was false when she wrote it, and that Employer relied on the answer in hiring Worker. We must determine whether, given the language of the question asked by Employer and the facts of this case, there was substantial evidence to support the judge's findings. *See Lamay,*

118 N.M. at 525–26, 882 P.2d at 566–67. We hold there was not.

*FACTS*

 Worker filled out her employment application on January 11, 1990. Therefore, it is Worker's knowledge and state of mind at that time that is crucial to the determination in this case. *Lamay*, 118 N.M. at 525–26, 882 P.2d at 566–67 (employer must prove a knowing misrepresentation by a worker to prevail on false representation defense). Important factual issues to be considered are what Worker's physical condition was at the time she filled out the employment application, what Worker knew about that physical condition, what Worker might have known about Employer's purpose in asking the specific question at issue here, how a reasonable person would have interpreted the question asked by Employer, and what Worker knew about the tasks of the job for which she was applying. *Id.*

At the time Worker applied for her position with Employer, she had a degenerative disc condition in her back. There is no evidence, however, that she knew of that diagnosis at the time of the application. It appears that it was first diagnosed in x-rays taken in April 1991, after Worker was injured when an automobile crashed into the cashier's office at Employer's place of business. Worker did know that she had problems with her back episodically over the fifteen-year period preceding the application. She had been off work once for approximately two weeks due to a back strain when she was in her late teens or early twenties. Later, in 1985, she was hospitalized for a few days with another back strain. Dr. Caldwell, an orthopaedic surgeon, testified that the hospital records describe Worker as suffering mostly a backache, caused by muscle spasms. The hospital records reveal a final diagnosis of thoracolumbar muscle spasm and lumbosacral strain. There is nothing to indicate that Worker was told at this time that she had degenerative disc disease, or should avoid certain activities, or was at risk for further injury to her back.

Worker's family physician, Dr. Maley, testified that Worker suffered no more recorded episodes of back difficulties following the 1985 hospitalization until over a year *after* she began working for Employer. No physician ever restricted her activities in any way. In addition, there is no evidence that Worker herself limited her activities due to back pain or for any other reason. She testified that after starting the job in January 1990 she had no back problems until April 1991; she was "doing great."

Dr. Maley and Dr. Caldwell agreed that Worker had a long-term back condition caused by her degenerative disc disease. Dr. Maley did not believe that the condition was severe enough to warrant an impairment rating prior to the 1991 accident. Dr. Caldwell, on the other hand, thought that Worker did have a permanent partial impairment prior to that accident. However, she was unaware of this "impairment," and never sought any workers' compensation benefits for it.

Worker testified that when she applied for the cashier position, she thought the job entailed only cashier work. She did not realize that it included janitorial side work. Her supervisor, however, testified that the duties of a cashier included light cleaning, sweeping the lot, cleaning up oil or gasoline spills, stocking shelves with oil, and occasionally lifting cases of soda. He also testified that he explained these duties to Worker when she applied for the job. Employer had a form listing the duties, and the manager testified that he went over the form with Worker, and that she seemed to understand it. All employees read and sign such a form, and Worker read and signed it. There is no evidence that Employer specifically discussed the "physical limitations or chronic illnesses" question with Worker at the time she filled out the application.

*APPLICATION OF LAMAY TEST*

 Applying the *Lamay* test to this case, we must first determine whether the question "List any physical limitations or chronic illnesses" is so overly broad that, as a matter of law, a prospective employee could not be expected to provide an accurate answer. *Lamay*, 118 N.M. at 525–26, 882 P.2d at 566–67. We hold that this question is not so vague. Under certain circumstances, this question could call for completely factual information.

For example, where an applicant has suffered a prior injury and has been assigned a permanent partial impairment rating, or has been precluded by a doctor's order from performing certain types of work, this information would appear to fall under the category of a "physical limitation." Similarly, debilitating conditions caused by disease would seem to answer the "chronic illnesses" portion of the question. Therefore, since the question is not vague for all applicants under all circumstances, we cannot hold as a matter of law that a prospective employee could not be expected to provide an accurate answer, and thus that the question could never be the basis for a false application defense.

■ The next step in the *Lamay* analysis is to determine whether, given the language of the question, a reasonable person applying for the same job as Worker, knowing the same information about that job, having the same medical history as Worker, and the same knowledge as Worker about that history, would have understood that the question posed in the application called for a disclosure of that medical history. *Id.* In making this determination, we look to the whole record below and resolve all conflicts in the evidence in favor of the judge's findings. *See Tallman v. ABF (Arkansas Best Freight)*, 108 N.M. 124, 127, 767 P.2d 363, 366 (Ct. App.) (discussing whole-record standard of review), *cert. denied*, 109 N.M. 33, 781 P.2d 305 (1988).

■ One factual inquiry is the extent of Worker's knowledge concerning the duties of the position at the time she applied for it. This issue could be important in some cases because the worker's knowledge of the amount of strenuous work required in a position might have an effect on the way the worker or a reasonable person applying for the same job would view the questions asked on the application. In this case, Worker testified that she thought the duties were restricted to acting as a cashier. However, Employer's witness testified that he explained to Worker that the position included some light cleaning and stocking. Resolving this conflict in favor of Employer, as we must, we conclude that Worker knew or should have known that the position would require more strenuous physical effort than simply making change.

The next factual issue is the actual condition of Worker's back at the time she applied. If there were no evidence of an actual physical impairment or of a currently existing condition at the time of the application, Worker's negative answer to the question could have been true and our inquiry would cease. Dr. Maley's opinion was that the condition was not serious enough to warrant a partial impairment rating at that time, and she had never restricted Worker's activities. Dr. Caldwell, however, testified that Worker had an 8% impairment due to her degenerative disc disease, and that, if asked, he would have restricted her work activities due to that preexisting condition. Although he had never examined Worker before her 1991 accident, and he did not specify the date upon which the 8% impairment began, his testimony taken as a whole is probably sufficient to support a finding that, in January 1990, Worker actually had a "physical limitation" due to her back condition, and that her answer to the question was inaccurate.

But this is not to say that Worker either knew or should have known that her answer was inaccurate. As of January 1990, Worker knew only that she had a history of back problems. She had been hospitalized in 1985 for a back strain, and a number of years prior to that she had been off work for two weeks due to another back strain. In addition, she told Dr. Caldwell on her first visit that she had suffered episodic back problems since she was twenty years old. There is no evidence, however, that she suffered from any of these problems between 1985, when she was hospitalized, and January 1990. There is also no evidence that Worker was told to limit her activities, or was placed under any physical restrictions, by any physician prior to 1990. In addition, there is no evidence that Worker was ever told about her degenerative disc condition prior to the time of her application. Finally, there is no evidence either that Worker limited her activities on her own initiative, due to pain or discomfort caused by her back condition, or that she knew that certain activities could cause injury to her back. While the evidence

in this record would support a finding that Worker knew her back was susceptible to injury at times, that evidence does not support a finding that she knew about her degenerative disc condition, or about the impairment that condition had caused, or that she should limit her activities in order to avoid re-injuring her back.

The question we must answer, then, is whether a reasonable person who has had episodic problems with back strains, but knows of no resulting restrictions on her activities or lifestyle, would understand the phrase "physical limitations or chronic illnesses" to refer to her back problems. We hold that a reasonable person could not be expected to make that connection.

The normal, everyday understanding of the term "chronic illness" is a lingering or frequently recurring disease such as cancer, tuberculosis, malaria, or other similar afflictions. The phrase is not normally understood to refer to an episodic condition such as Worker's, which flared up only occasionally and at widely separated time intervals. *See Webster's Third New International Dictionary of the English Language, Unabridged* 402 (1976) (defining "chronic" as referring to frequent recurrences over a long period of time, or something that is unending, or of long duration). We therefore hold that a reasonable person in her position would not have understood the "chronic illnesses" portion of the question to call for disclosure of the back condition, especially since the condition was asymptomatic at the time of the application.

Similarly, we do not believe a reasonable person with Worker's knowledge would understand the term "physical limitation" to refer to her back condition. That term is commonly understood as some sort of restriction on the person's ability to perform certain activities. *See Webster's, supra,* at 1312 (defining a "limitation" as a restriction, restraint, restrictive weakness, or lack of capacity). The general understanding of a physical limitation is not just a physical condition; that understanding includes the idea that the condition causes an inability, to some extent, to fully perform normal physical activities. There is evidence in this case that

Worker knew she had a back condition. However, there is no evidence that she knew her condition limited her in any significant way at the time she applied for the cashier position. Therefore, Employer failed to establish that a reasonable person in Worker's position would have understood her back condition as within the term "physical limitations."

It may very well be true that by using the phrase "physical limitations or chronic illnesses" Employer intended to cover all significant physical and mental problems, including those not currently causing difficulties or restrictions. We will not, however, expand the meaning of those phrases beyond their ordinary, commonly understood meanings. Employer drafted the questions on the application and knew what type of information would be useful to obtain. If Employer desired more specific factual information, it would have been easy to ask clearly for that information. For example, Employer could have asked whether Worker had ever been hospitalized, or had received an impairment rating, or had her lifting capacity restricted. Any number of similar questions could be devised to require disclosure of specific factual information that would reveal the existence of conditions such as Worker's.

We see no unfairness in construing Employer's question narrowly to call for disclosure of exactly the types of problems signified by the plain meaning of the words used in the question. *Cf. Smith v. Tinley,* 100 N.M. 663, 665, 674 P.2d 1123, 1125 (1984) (ambiguities in a contract are to be construed against party that drafted document); *Restatement (Second) of Contracts* §§ 168, 169 (1981). This is especially so in light of the grave consequences possibly attending a wrong answer to the question—namely, a finding that the wrong answer was given deliberately, and the consequential forfeiture of all workers' compensation benefits. The false application defense is not a litigation tactic to be used, in retrospect, to attempt to avoid responsibility for an employer's obligations. Instead, it is designed to redress the unfairness that results when a worker deliberately responds falsely to a question that asks for information the employer genu-

inely wants to know. Therefore, the questions asked by an employer should be construed to mean exactly what the words say, instead of allowing an employer to argue later for a broader interpretation in an effort to avoid due compensation.

We have held that a reasonable person in Worker's position would not have understood the question to refer to her back condition. That is not the end of the *Lamay* inquiry. We must also determine whether there is any evidence that Worker actually knew, from any source, that the question was referring to that condition. *Lamay*, 118 N.M. at 526, 882 P.2d at 567 (discussing the "subjective test"). For example, it is possible that during an interview, an employer might discuss the tasks of the position and let the applicant know that it is important to disclose any prior injury resulting in hospitalization or other medical treatment. *See also Gray v. J.P. (Bum) Gibbins, Inc.,* 75 N.M. 584, 587, 408 P.2d 506, 507 (1965). In this case, however, there is no evidence indicating that Worker was told anything during the application process about the questions on the application. There is also no evidence showing that Worker was informed that Employer wanted to know about her episodic back troubles, her prior hospitalization, or about any medical conditions other than the physical limitations or chronic illnesses asked about in the application. For this reason, application of the subjective test does not lead to a denial of benefits.

CONCLUSION

Denial of benefits on the basis of Worker's job application was error. We reverse the judge's decision, and we remand this case for consideration of the merits of Worker's claim.

**IT IS SO ORDERED.**

PICKARD and BOSSON, JJ., concur.